**Sylvia Berry HOLTON**

v.

**David MOHON, "Female Dispatcher", William Speers and Parker County, Texas.**

**Civ. A. No. 4–85–065–K.**

United States District Court, N.D. Texas, Fort Worth Division.

Sept. 3, 1987.

As Amended Sept. 8, 1987.

H. Deloyd Bailey and Stephen R. Marsh, Wichita Falls, Tex., for plaintiff.

Rowena Young, Asst. Atty. Gen., Jim Mattox, Atty. Gen. of Texas, Austin, Tex., for defendant Mohon.

Jim Claunch, Fort Worth, Tex., and James O. Mullin, Weatherford, Tex., for defendant "Female Dispatcher".

Jerry J. Loftin, Fort Worth, Tex., for defendant Parker County, Tex.

BELEW, District Judge.

## STATEMENT OF FACTS

Plaintiff Sylvia Holton brings this lawsuit under 42 U.S.C. § 1983 [1] alleging that she was unlawfully arrested by Trooper Mohon and unlawfully searched by Parker County Jail officials. This Court must determine if such acts occurred and if such occurrence rose to the level of a constitutional violation.

On July 27, 1984, Sylvia Holton, Plaintiff, and Helen Mena had dinner at the Steak and Ale restaurant. Both women were nurses working at Palo Pinto General Hospital; Helen Mena was evaluating Sylvia for a promotion. While at dinner, both women drank two glasses of wine. After eating dinner, the women proceeded to Wet Willies, a bar and dance hall. There, both women had two mixed drinks. They left after midnight and were proceeding home on F.M. 2552. The women decided to stop at the Iron Skillet, a truckstop, in Weatherford, Texas to eat and use the restroom. It appears that Sylvia Holton had the car headlights on high beam.

Shortly before the exit, the women were approached by two oncoming cars. Neither car blinked its headlights or in any way indicated that Sylvia had her bright lights on. One of the approaching vehicles was driven by Trooper David Mohon of the Department of Public Safety. Mark Jackson, an off-duty Weatherford police officer

---

**1.** 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."

and acquaintance of Plaintiff, was accompanying Trooper Mohon that night as part of a college course. Trooper Mohon determined that Sylvia's conduct of failing to dim her headlights when within 500 feet of approaching cars was a violation of the traffic code. He accordingly turned his car around and began pursuing Sylvia Holton. Trooper Mohon attempted to stop Sylvia by flashing his headlights, flashing a red spotlight, flashing his red and blue grill lights and briefly sounding his siren. Sylvia Holton failed to respond to these signals and independently came to a stop at the Iron Skillet.

The first time Sylvia noticed Trooper Mohon was when he appeared at her car door at the Iron Skillet. He approached Sylvia, identified himself and asked for her driver's license. Sylvia fumbled for it and gave Trooper Mohon her driver's license. At this time, Defendant Mohon observed Sylvia's slurred speech and smelled alcohol on her breath. Sylvia had not yet seen Mark Jackson and told Trooper Mohon to call him because he could "vouch" for her. In response, Trooper Mohon indicated that Mark Jackson was present. Trooper Mohon began to question Sylvia. She was not warned of her rights. He asked Sylvia how many drinks she had consumed that evening and she responded "two". Trooper Mohon continued to question Sylvia. Often she failed to comprehend his questions and so Trooper Mohon repeated them. One such question was whether Sylvia would agree to undertake a field sobriety test. Although indicating a willingness to take a field sobriety test, Sylvia did not take such a test at the Iron Skillet.

Trooper Mohon subsequently placed Sylvia under arrest for driving while intoxicated ("DWI"). Trooper Mohon attempted to place Sylvia in his patrol car. When she resisted, he handcuffed her and forcibly placed her in his car. Helen Mena was also placed in the car. Trooper Mohon told Sylvia that he would like to conduct an alcoholic content test. Sylvia requested a blood test. They were taken to the Department of Public Safety where Sylvia consented to having an intoxilyzer test performed. The test revealed that Sylvia had a blood alcohol content of 0.09 percent. A blood test was never administered although Trooper Mohon later gave her that option but Sylvia never responded.

Trooper Mohon next took Sylvia to Parker County Jail to be processed and booked. Trooper Mohon had no discretion in deciding where to take Sylvia for processing; DPS officers must take the accused to the jail of the county in which the offense is committed. At the jail, Sylvia consented to a field sobriety test which was videotped. Sylvia was unable to count from 1001 to 1010; likewise, she hesitated in her recitation of the alphabet. Also, Sylvia had difficulty comprehending Trooper Mohon's instructions that she walk heel to toe, and had difficulty physically following those instructions. Sylvia was unable to correctly recite her social security number.

After Sylvia took the field sobriety test, she was booked into the jail. At this time, Helen Mena was released. Carlee Seidel, a female dispatcher for the Parker County Sheriff's Office, was told to conduct a strip search of Sylvia. Such search was *not* made at Trooper Mohon's request or order; rather, such search was made pursuant to Parker County's policy. The Sheriff of Parker County has a policy requiring that all prisoners being placed in the jail be searched. Such policy is made to protect both the prisoners, as well as other inmates. Likewise, the Parker County Jail has a policy that any prisoner charged with a felony, or a crime of violence or misdemeanor involving drugs or alcohol be strip searched. The jail requires strip searches for both men and women; the only restriction is that male personnel only may search male prisoners and female personnel only may search female prisoners. The Parker County Jail has no formal policy that all females charged with DWI be strip searched.

Carlee Seidel, dispatcher, was called by Jailer Leo Peet and told to conduct a strip search of Sylvia because there were no female jailers available. Carlee Seidel accompanied Sylvia Holton to the ladies' restroom. Ms. Seidel told Sylvia to remove *all*

her clothing. Ms. Seidel observed Sylvia's disrobing from a distance. Once undressed, Sylvia was asked to bend over and cough which she did. Ms. Seidel found nothing and then left the room. It is disputed whether Carlee Seidel actually searched Sylvia's clothing. Sylvia dressed and walked back out to the jail.

Immediately before Sylvia was placed in a jail cell, Mark Jackson asked if he could post a personal bond for Sylvia. Although unusual, the Parker County Jail agreed to release Sylvia to Mark Jackson's custody. He took her to her house.

Since this incident, Sylvia Holton has suffered an increased number of migraine headaches. Before the incident, Plaintiff suffered migraine headaches about once a year. Immediately following this incident, she suffered headaches two or three times a month. She is currently suffering from approximately one migraine headache a month. Plaintiff also complains of nightmares. Immediately following the incident, she experienced nightmares of someone screaming and physically pushing at her about three or four times a week. She has not had such a nightmare for about two years.

Plaintiff also complains of feeling mad, terrified and humiliated. Likewise, Sylvia Holton complains of medical problems. She suffered diarrhea for six months following this incident. She also began using Xanex, a mild tranquilizer, after the incident. It was prescribed to her "as needed". Sylvia incurred medical bills of $327.00 for doctor's visits and prescriptions after the incident. Plaintiff also complains of emotional problems; she does not like to travel through Parker County and will reroute her drive if possible.

## DISCUSSION

The first inquiry in a § 1983 suit is whether Plaintiff has been deprived of a right "secured by the Constitution and laws." *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979); *Garris v. Rowland,* 678 F.2d 1264, 1270 (5th Cir.1982). The Fourth Amendment to the United States Constitution provides in relevant part:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause....

Plaintiff specifically alleges that she was unlawfully arrested by Trooper Mohon and unlawfully searched by Parker County Dispatcher Carlee Seidel. Plaintiff argues that such actions provide a basis for a § 1983 action.

█ To prevail on a § 1983 claim for false arrest, Plaintiff must prove that the officer made the arrest without probable cause. *Hinshaw v. Doffer,* 785 F.2d 1260, 1266 (5th Cir.1986). "Probable cause" exists where "the facts and circumstances within ... [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* (citations omitted).

█ The first thing this Court will consider is Trooper Mohon's decision to stop Plaintiff. Trooper Mohon observed Plaintiff Sylvia Holton travelling with her headlights on high beam in the face of the oncoming traffic. Failure to dim your bright lights when within 500 feet of approaching traffic is a traffic violation. Upon observing the conduct, Trooper Mohon had a duty to stop Sylvia Holton. Therefore, it was reasonable for Trooper Mohon to stop Sylvia.

Trooper Mohon actually stopped and confronted Sylvia at the Iron Skillet. He subsequently arrested Sylvia for DWI. Under the laws of Texas, it is an offense if a person is intoxicated while driving or operating a motor vehicle in a public place. Vernon's Ann.Civ.St. art. 6701*l*-1(b). It is well-established that an officer's conducting an arrest without probable cause is actionable under 42 U.S.C. § 1983. *See Garris,* 678 F.2d at 1270-71. For Trooper Mohon's arrest to be valid, he must have had probable cause to believe Sylvia Holton was DWI. The Court is cognizant of the

following facts: (1) Plaintiff had at least four alcoholic beverages that evening; (2) Plaintiff failed to dim her headlights; (3) Plaintiff failed to notice the flashing red and green lights of Trooper Mohon's car following her; (4) Plaintiff's speech was slurred; (5) Plaintiff was speaking loudly; (6) Plaintiff's breath smelled of alcohol. This Court recognizes all these facts would support a finding of probable cause. This Court likewise notes that Mark Jackson, an acquaintance of Sylvia, testified that Sylvia was uncharacteristically loud and uncooperative that evening.

While at the Iron Skillet, Trooper Mohon asked Sylvia how many drinks she had consumed that evening and she responded "two". Plaintiff argues that such statement was made without Plaintiff's first being given her *Miranda* warnings and consequently such statement could not supply Trooper Mohon with the probable cause needed to arrest Sylvia. *Miranda* warnings must be given to a detainee if he/she is "in custody". *United States v. Alvarado Garcia,* 781 F.2d 422, 425 (5th Cir.1986), *citing Berkemer v. McCartney,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). An individual detainee is "in custody" if he/she does not feel free to leave.

■ In *Garcia,* the Fifth Circuit enunciated its four factor test to determine if an individual is "in custody"; the relevant factors include: (1) whether there was probable cause to arrest, (2) whether the law enforcement officer had a subjective intent to hold the defendant; (3) whether the defendant had a subjective belief that his freedom was significantly restricted; and (4) whether the focus of the investigation was on the defendant at the time of questioning. *Garcia,* 781 F.2d at 425–26. As already discussed above, Trooper Mohon had probable cause to arrest Sylvia for DWI. The second and third factors to be considered deal with the parties' subjective intent at the time of the stop.

On the night in question, Sylvia had pulled her car into the Iron Skillet to use the restroom and to get something to eat. It was there that Trooper Mohon made his stop of Sylvia Holton to investigate a traffic violation. In *Berkemer,* the Supreme Court held that roadside questioning of a motorist detained pursuant to a routine traffic stop does *not* amount to "custodial interrogation." The Supreme Court articulated two major reasons for its holding. First, a motorist is not in custody because of his own subjective impression of the stop; he expects that a routine traffic stop is temporary and brief. *Berkemer,* 468 U.S. at 437–38, 104 S.Ct. at 3148–49. Second, the circumstances associated with a typical traffic stop are not such that the motorist feels completely at the mercy of the police; for example, the public setting for the stop and the fact that only one or two officers were present. *Berkemer,* 468 U.S. at 438–39, 104 S.Ct. at 3149–50.

In the instant case, Sylvia Holton was stopped for failing to dim her headlights. Such a stop is typically short and temporary. Sylvia testified that she did not consider herself intoxicated and therefore, she had no reason to believe that the stop would not be temporary and short. Second, Trooper Mohon attempted to stop Sylvia Holton on the open highway but she did not respond to his warnings. They eventually came to a stop in the parking lot of the Iron Skillet. The brief detention occurred in full view of the patrons and passersby. The Supreme Court recognized that such exposure to public view typically safeguards the motorist's rights.

■ The fourth factor to be considered is whether the focus of the investigation was on the defendant at the time of the questioning. In *Garcia,* the Fifth Circuit noted that "if none of the other factors are present, the fact that the investigation is focused upon the defendant is insufficient to render the interrogation custodial." *Garcia,* 781 F.2d at 426, *citing United States v. Warren,* 578 F.2d 1058, 1072 (5th Cir.1978), *rev'd in part on other grounds,* 612 F.2d 887 (5th Cir.) (en banc), *cert. denied,* 464 U.S. 956, 100 S.Ct. 2928, 64 L.Ed. 2d 815 (1980); *United States v. Carollo,* 507 F.2d 50, 52–53 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975). This Court is therefor not bound to consider this factor.

Our consideration of these four factors leads this Court to the conclusion that Sylvia Holton was not "in custody" immediately following the stop at the Iron Skillet and therefore, need not have received her *Miranda* warnings immediately upon being stopped.

■ Assuming *arguendo* that Sylvia Holton was in custody at the Iron Skillet, this Court finds that her constitutional rights were not violated because no testimonial communication formed the basis of her arrest. This Court notes that Trooper Mohon did ask Sylvia how many drinks she had consumed that evening and she responded "two". Plaintiff is correct in her argument that such statement given without being informed of her *Miranda* rights could not supply Trooper Mohon with the probable cause necessary to arrest Sylvia. This Court is not convinced that Trooper Mohon utilized such statement in making his probable cause determination. This Court notes the following facts to support Trooper Mohon's determination: (1) Sylvia's failure to dim her headlights; (2) Sylvia's failure to notice and respond to flashing red and green lights; (3) Sylvia's loud speech; (4) Sylvia's slurred speech; (5) Sylvia's breath smelled of alcohol. The use of such nontestimonial evidence does not violate Sylvia's Fifth Amendment privilege against self-incrimination. *See United States v. Dionisio,* 410 U.S. 1, 5–7, 93 S.Ct. 764, 767–68, 35 L.Ed.2d 67 (1973); *Schmerber v. California,* 384 U.S. 757, 760–65, 86 S.Ct. 1826, 1830–32, 16 L.Ed.2d 908 (1966). From the five enunciated factors above, this Court concludes that Trooper Mohon had probable cause to arrest Sylvia Holton for DWI. Such finding is independent of her statement regarding her consumption of two drinks that night.

■ Such a finding leads this Court to a discussion of qualified immunity. Qualified immunity is available only to governmental officials performing discretionary functions. *Harlow v. Fitzgerald,* 457 U.S.

800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Once an official establishes that he was acting within the scope of his discretionary authority, this Court must determine *whether his conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.* *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).

■ Trooper Mohon asserts that he is entitled to a qualified good faith immunity defense. Because the Fourth Amendment rule on warrantless arrests is "clearly established" law, the defense of qualified immunity is available only if a reasonable officer would have believed that probable cause existed to believe that an offense had been committed. *Trejo v. Perez,* 693 F.2d 482, 488 (5th Cir.1982). All the evidence adduced at trial supports Trooper Mohon's determination that probable cause existed to arrest Sylvia for DWI. Chief Joe Milner who testified at trial is in charge of all state troopers and an expert regarding the policies and standards of the Department of Public Safety. Chief Milner testified that experience has shown that intoxicated persons commonly fail to dim their headlights in the face of oncoming traffic. Chief Milner likewise testified that, given the facts of this case, a reasonable officer would have a suspicion that the driver was impaired. Therefore, it appears to the Court that Trooper Mohon is entitled to a qualified good faith immunity defense.

Plaintiff next alleges that she was unlawfully searched by Parker County Dispatcher Carlee Seidel. Plaintiff alleges that the strip search policy of Parker County and the actual strip search and body cavity search conducted by Carlee Seidel violated her Fourth Amendment Rights.[2]

In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme

---

**2.** The Fourth Amendment states "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Court scrutinized the practice of the Metropolitan Correctional Center (MCC), a federally operated short-term custodial facility designed to house pre-trial detainees, requiring all detainees to submit to a strip search and visual body cavity inspection after a contact visit with someone outside the facility. The Supreme Court concluded that such searches did not violate the Fourth Amendment because it prohibited only unreasonable searches and the Court determined that these searches were not unreasonable. 441 U.S. at 558, 99 S.Ct. at 1884. The Supreme Court set forth a standard for determining the "reasonableness" of a search; it stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884.

In *Wolfish*, the Supreme Court concluded that the MCC's practice of searching detainees was reasonable after consideration of the four above enunciated factors. The Court acknowledged that these searches may seriously invade the inmate's privacy. However, the Court placed great emphasis on the pecularities of a detention facility. It noted that the serious security dangers of a detention facility justify such an invasion of privacy. The Court went on to note that these searches must be conducted in a reasonable manner. In concluding its discussion on this matter, the Court stated that in "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that ... [visual body-cavity inspections] can [be conducted on less than probable cause]." *Wolfish*, 441 U.S. at 559–60, 99 S.Ct. at 1885.

In *Stewart v. Lubbock County, Texas*, 767 F.2d 153 (5th Cir.1985), the Fifth Circuit first evaluated the constitutionality of a strip search policy. The policy of the Lubbock County jail permitted a strip search of any arrestees, regardless of the severity of the charged crime. The jailers were not required to suspect the arrestee of possessing weapons or contraband before conducting a search. After considering leading cases in this area,[3] the Fifth Circuit concluded that Lubbock County's strip search policy was unreasonable and violative of the Fourth Amendment. *Stewart*, 767 F.2d at 156–57. The Court reasoned so "[b]ecause Lubbock County's strip search policy was applied to minor offenders awaiting bond when no reasonable suspicion existed that they as a category of offenders or individually might possess weapons or contraband." *Stewart*, 767 F.2d at 156.

In the instant case, Plaintiff was subjected to a strip search and body cavity search upon being booked at the Parker County Jail. Plaintiff had been charged with DWI. Carlee Seidel, a female dispatcher of Parker County, accompanied Plaintiff to a bathroom and told her to disrobe. After undressing fully, Plaintiff was told to bend over and cough. Carlee Seidel did not touch Plaintiff; rather, she observed her from a distance.

In her deposition, Carlee Seidel indicated that it was the policy of Parker County to require and conduct strip searches of females charged with DWI. Carlee Seidel testified that she, had personally conducted between 150 and 200 such searches. Carlee Seidel also testified that she was a dispatcher and that she conducted these searches only in the absence of a female jailer.

■ The Supreme Court in *Bell v. Wolfish*, recognized that a body cavity search is highly intrusive. This Court concedes that Carlee Seidel's taking of Plaintiff to a private bathroom is perhaps the most unintrusive manner of conducting such a search. There appears to be no independent justifi-

---

**3.** *Bell v. Wolfish; Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir.1983); *Logan v. Shea-* *ly,* 660 F.2d 1007 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).

cation for conducting such a search of Plaintiff; the purpose of conducting a strip search and body cavity search is to look for weapons or contraband in an attempt to protect both the inmates as well as the jail personnel. In the instant case, Plaintiff was initially stopped for a routine traffic violation. Upon conversing with her, Officer Mohon determined that Plaintiff was intoxicated and subsequently arrested her for DWI. There was never any indication that Plaintiff was harmful or that Plaintiff might be carrying a weapon or contraband. There has been no evidence adduced at trial that Trooper Mohon, Parker County Jail officials or Carlee Seidel had reasonable suspicion to believe that Plaintiff carried any weapons or contraband. Therefore, this Court concludes that the strip search and body cavity inspection were unreasonable.

After having determined that a constitutional violation occurred, this Court must now consider whether the defense of qualified immunity applies in this case. Qualified immunity is available only to governmental officials performing discretionary functions. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Once an official establishes that he was acting within the scope of his discretionary authority, this Court must determine *whether his conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). The Fifth Circuit has clarified the process by noting that the Supreme "Court has effectively created ... [the following] two level progressive inquiry:

(1) Was the law clearly established at the time? If the answer to this threshold question is no, the official is immune.

(2) If the answer is yes, the immunity defense ordinarily should fail unless the official claims extraordinary circumstances and can prove that he neither knew nor should have known that his acts invaded settled legal rights."

*Trejo v. Perez,* 693 F.2d 482, 485 (5th Cir. 1982).

This Court is now called upon to determine whether Defendants' conduct violated "clearly established" law. To this end, this Court must look to the law as it existed at the time of the alleged violations, i.e. up to July 27, 1984.

Plaintiff contends that the law prohibiting strip searches under such circumstances was clearly established at the time of her arrest, based on the balancing test set out in *Bell v. Wolfish,* as well as the decisions of other District Courts and Circuit Courts of Appeal. The Fifth Circuit did not make its ruling that the policy of blanket strip searches performed on misdemeanor arrestees charged with drug or alcohol crimes in the absence of a reasonable suspicion that the person searched was concealing a weapon or contraband was unconstitutional until *after* the Plaintiffs' arrest. *See Stewart v. Lubbock County, Texas,* 767 F.2d 153 (5th Cir.1985).

Despite its creation of the "clearly established" standard, the Supreme Court has not yet provided a standard for when a right has been "clearly established." *See Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 n. 32, 102 S.Ct. 2727, 2738 n. 32, 73 L.Ed.2d 396 (1982). Defendants seem to contend that they are not bound unless the Fifth Circuit has clearly established the rights in issue.

It has been clearly established for some time that a search is "unreasonable" if it violates the searched person's constitutional rights. *Bell v. Wolfish,* 441 U.S. at 558–59, 99 S.Ct. at 1884; *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed. 2d 65 (1983); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Further, at least two Circuits held, prior to Plaintiff's arrest, that strip searches under similar circumstances are unreasonable. *See Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir.1983); *Logan v. Shealy,* 660 F.2d 1007 (4th Cir.1981), *cert. denied,* 455

U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). Defendants, a county and law enforcement officers, should have known the standards of *Bell v. Wolfish* and should have known of the decisions in *Logan* and *Mary Beth G.* Defendants should not be able to adopt a "wait and see" attitude in the face of such authority and continue a dubious practice while awaiting a direct ruling from the Fifth Circuit.[4]

Defendants point to the cases of *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) and *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed. 2d 438 (1984) in an attempt to prove that the law regarding strip searches was not "clearly established" at the time of Plaintiff's arrest. Both decisions were published on July 3, 1984, a couple of weeks before Plaintiff's arrest. Defendants cite both cases as standing for the proposition that jail administrators are given great deference in running their jails, even if their actions violate inmates' rights. Defendants seek to show that the Supreme Court, in these rulings, had not yet clearly established the law regarding inmate rights. This Court is not persuaded by such argument.

In *Hudson v. Palmer*, the Supreme Court held that a prisoner does not have a reasonable expectation of privacy in his prison cell so that he is not protected against unreasonable searches by the Fourth Amendment. In support of its holdings, the Supreme Court reasoned that institutional security and internal order of jails were of paramount concern. *Hudson*, 468 U.S. at 527–28, 104 S.Ct. at 3200. The Court noted that prison administrators had great deference in determining what steps are necessary to ensure the safety of prison staff, administrative personnel, visitors, as well as inmates themselves. *Id.* at 526–27, 104 S.Ct. at 3200.

In *Block v. Rutherford*, the Court held that a jail's blanket prohibition of contact visits by detainees was an entirely reasonable, nonpunitive response to the legitimate security concerns of a jail administration and therefore consistent with the Fourteenth Amendment. *Block*, 468 U.S. at 588, 104 S.Ct. at 3233. Again, the Court seemed to defer to the informed discretion of the jail administrators. A second issue presented in this case was whether the jail's practice of permitting random shakedown searches of individual cells without the cell occupant's presence violated the Fourth Amendment. The Court concluded that such a practice was reasonable and therefore valid under the Constitution. *Id.* at 590–91, 104 S.Ct. at 3234–35.

This Court therefore concludes that the law prohibiting strip searches and visual body cavity inspections in situations like Plaintiff's was clearly established at the time of Plaintiff's arrest. Under the analysis set forth in *Trejo*, this Court must next consider whether extraordinary circumstances existed and whether Defendants can prove that they neither knew nor should have known that their acts violated Plaintiff's settled legal rights. No such testimony was produced at trial. Therefore, it appears that Carlee Seidel and Parker County are not entitled to the defense of qualified (good faith) immunity.

■ Plaintiff alleges that Trooper Mohon should also be liable for the strip search and visual body cavity inspection. The evidence at trial proves that Trooper Mohon had no discretion in choosing to which jail to bring Plaintiff; he was required to deliver Plaintiff to Parker County Jail for booking. Once at Parker County Jail, Trooper Mohon relinquished all control of the situation to Parker County officials. Trooper Mohon in no way requested or encouraged the strip search of Plaintiff. Therefore, this Court finds that Trooper Mohon's personal actions did not cause Plaintiff's rights to be violated and therefore Trooper Mohon cannot be held liable for damages caused by the strip search. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978).

---

**4.** The Fifth Circuit, in *Stewart,* did rely on the balancing test established by *Bell v. Wolfish* in finding Lubbock County's strip search policy unreasonable. *Stewart,* 767 F.2d at 156–57.

Thus, the standards applied, those of *Bell v. Wolfish,* were clearly established at the time of Plaintiff's arrest.

The Court finds that Plaintiff should recover nothing of and from Trooper David Mohon.

In conclusion, this Court finds that Parker County and its officials violated Sylvia Holton's constitutional rights. Since they are not entitled to the qualified immunity defense, they are liable for damages suffered by Plaintiff. This Court finds that Sylvia Holton suffered both physically and psychologically from the actions of Parker County officials. Sylvia Holton incurred medical expenses as a result of the incident.

■■■ The Court is of the opinion and finds that Carlee Seidel was an employee of Parker County, Texas, and was following the directions of her employer in performing the strip search in question. Because Carlee Seidel was acting pursuant to the policy of Parker County in conducting such a search, Parker County shall be solely liable for damages suffered by Sylvia Holton.

■■■ The Court is of the opinion and finds that Sylvia Berry Holton should recover of and from Parker County, Texas for her damages the sum of Twelve Thousand Dollars ($12,000.00) with interest thereon at the rate of 6.98% per annum until paid.

Plaintiff also sought an injunction against Parker County Jail officials to enjoin it from conducting strip searches of persons arrested for DWI without any reasonable suspicion that they possessed weapons or contraband. This Court finds that it is not necessary to issue such an injunction at this time. This Court is confident that Parker County will adhere to the Court's judgment and will take reasonable steps to comply with this Opinion.

A final judgment wil be entered after a hearing on and determination of attorneys' fees and litigation expenses to be assessed against Defendant Parker County.

IT IS SO ORDERED.